No. 30,858.

THE STATE OF KANSAS, *Appellee*, v. ARTHUR RYAN, *Appellant*.

(22 P. 2d 418.)

Opinion filed June 10, 1933.

*T. W. Bell* and *C. M. Stokes,* both of Leavenworth, for the appellant.

*Roland Boynton,* attorney-general, *Lawrence F. Day,* county attorney, and *C. C. Stewart,* of Lawrence, for the appellee.

The opinion of the court was delivered by

SMITH, J.: In this case the defendant was convicted of murder in the second degree, and appeals.

The defendant shot and killed Ernest Penny. He made the plea of self-defense. He was living in Atchison with a woman who was not his wife, but whom he married some time between the killing and the trial. On the day of the homicide the deceased with two

other men came to the home of defendant. Their story was that they came there to buy a drink. One of them testified that he had bought liquor there in the past. Defendant denied this.

At the time the three men came to the home of the defendant there were present defendant, the woman with whom he was living and another colored woman named Mrs. Waterhouse.

The story of one of the survivors was that when he came into the kitchen some buttons in the front of his pants were unbuttoned. His story of the tragedy is that Mrs. Waterhouse made the remark, "You must be advertising," and that one of the men said, "You have a right to." His story is that he then said he had to "go out and take a leak"; that while he was outside he heard loud voices and when he came into the room Ryan was in the corner near a chest of drawers. When the witness came into the room the witness took hold of deceased and said, "Let's go." Deceased shoved the witness away and he fell. Deceased then put his hand in his pocket, and defendant then said to him, "Take your hand out of your pocket." The witness stated that deceased took his hand out of his pocket and opened it up and that then defendant reached into the chest of drawers, got a gun and shot deceased three times. That is the story as told by the white witnesses.

The story told by the colored witnesses was somewhat different. The colored woman with whom defendant was living testified that when the three men came in the door, one of them made an indecent proposal to her; that one of them dropped his pants to the floor exposing his private parts; that Ryan objected to such actions in his house and shortly after this incident defendant left the room. She further testified that while defendant was out of the room the men kept after her and that Ryan called to them to come out. Her story agreed with the story of the white witnesses—that one of the witnesses took hold of the deceased, attempted to get him to leave and was shoved away and pushed down just before the shooting occurred. According to her story deceased was walking toward defendant saying, "If you are talking to me I will see about it damned quick." Just at this time the shots were fired. The story of all the colored witnesses substantially agreed with this.

After the shooting defendant fled and went to Kansas City. He testified that he did this because he was afraid of mob violence. He was arrested about three months later in Leavenworth and brought back to Atchison for trial. He was at first held in the city

jail, and while there he made a statement to the county attorney. The statement was about the same as the story told by the colored witnesses. It was testified to by the county attorney at the trial.

Several errors are argued by defendant. The court gave the following instruction to the jury:

"Evidence has been offered in this case tending to show flight by the defendant from the state of Kansas to the state of Missouri, at and immediately after the time of the crime charged against him in this case. If you find from the evidence that the defendant did immediately after the killing flee to a distant section of the country, and that such flight was induced by the killing and the belief on the part of the defendant that he would be charged with the killing in a criminal case, then this circumstance may be considered by you in connection with all the other evidence in the case to aid you in determining the question of his guilt or innocence."

Defendant argues that this instruction was erroneous because it did not further instruct the jury that if it was found from the evidence that the flight, if there was any, was induced by fear of mob violence, that such action should have no detrimental effect upon the defendant's presumed innocence when considering the question of his guilt or innocence.

The answer of the state to this argument is that such an instruction was not requested by defendant. It is argued that the failure of the court to give a particular instruction is not error when the failure is not called to the attention of the trial court till after the verdict. This is the general rule, but where the court on its own motion gives an instruction on a particular phase of the case it is error if the instruction does not as fully cover that phase as the evidence warrants. The instructions in a criminal case are given by the court pursuant to R. S. 62-1447, which is, in part, as follows:

"The judge must charge the jury in writing, and the charge shall be filed among the papers of the cause. In charging the jury he must state to them all matters of law which are necessary for their information in giving their verdict."

In the case of *State v. Winters*, 81 Kan. 414, 105 Pac. 516, this court said, in speaking of an argument that a certain instruction was not requested:

"From all the decisions noted it may be concluded that the statute means what it says and should be followed, but that a duty rests on counsel for the defendant to aid and not to ambush the court, and consequently instructions should be requested covering all lesser degrees or lesser crimes involved in the main charge which the defendant desires to be considered. A request suffi-

cient to direct the mind of the court to the subject is enough. Good instructions need not be offered, or a good theory for them formulated; and the evidence itself may point so plainly to the necessity for such instructions that no request is necessary." (p. 421.)

This decision was followed in *State v. Curtis*, 93 Kan. 743, 145 Pac. 858, where the court, after quoting the language just given from *State v. Winters*, said:

"A request for instructions upon the lesser degrees, which the court by this instruction held not applicable, would only direct attention again to a matter considered and acted upon. There was no ambush." (p. 752.)

In *State v. Fairlamb*, 121 Mo. 137, the court said:

"It is not every going away from the place of the homicide that raises the presumption of the guilt of the accused, and when the facts tend to show that the purpose of going away was not to avoid arrest, the instruction should be so framed as to include all the circumstances, that the defendant may have the benefit of such explanatory facts." (p. 148.)

This opinion is the basis for the rule laid down in 16 C. J. 985. In this case all the circumstances surrounding the homicide, like the flight of the defendant and the testimony of defendant, together with his statement, make it imperative that besides the instruction which called the attention of the jury to the flight of defendant there should have been one which called attention to the claim of defendant that he fled to escape mob violence.

Another error of which complaint is made is with reference to the selection of the jury. The journal entry recites that during the process of impaneling the jury there were not enough jurors present to form a panel and both parties agreed that the court might make a list of persons having the qualifications of jurors and order the sheriff to summon these persons as jurors. The journal entry then recites that a jury was impaneled to try the case. At the hearing of the motion for a new trial defendant introduced an affidavit that in fact the sheriff picked the list of jurors and that the names of the father and father-in-law of the sheriff were included in the list of jurors. The affidavit of defendant stated that he and his counsel were ignorant of this relationship and did not learn of it until the trial had been proceeded with, when it was discovered by them. The affidavit stated that defendant did not ask for the discharge of the jury but "left it to the court." In the affidavit and the oral argument it was urged that this was ground for a new trial. It would seem that the ordinary practice would be for counsel for the de-

fense to inquire of a prospective juror about his relationship with people interested in the outcome of the case. Evidently that was not done in this case. On the other hand, it would seem in a county as populous as Atchison enough people could be found to make a jury without calling relatives of court officers. By itself this would not be sufficient to warrant a reversal, in view of the fact defendant did not raise the point till the hearing of the motion for a new trial. It is a practice, however, of which this court cannot approve.

Another matter urged by defendant is the difficulty which his counsel encountered in talking to him in company with the wife of defendant. At the hearing of the motion for a new trial an affidavit of defendant was introduced in which he swore that he was not permitted to see counsel, except with a police officer present, until a few days before the trial. From what has been said by counsel for both sides it appears that hardly sufficient opportunity was given defendant and his wife to consult with counsel. It is a well-settled rule that one accused of crime and confined in jail awaiting trial must be accorded every opportunity to prepare his defense compatible with his safe-keeping. This court is not able to say that such opportunity was given defendant in this case.

Another matter brought to our attention in this case is the fact that the county attorney testified as to the statement defendant made to him and continued to act as counsel for the state. This statement was an important part of the state's case and had a marked bearing on the question of the plea of self-defense. It tended to contradict in some particulars the evidence of defendant as given from the stand. There is danger that a jury will attach more importance to the testimony of a lawyer in a case than to an ordinary witness. The better practice would have been for the county attorney to have stepped out of the case when it became necessary for him to testify. (See Canons of Professional Ethics No. 19, 135 Kan., p. iii.)

The judgment of the district court is reversed with directions to grant defendant a new trial.